IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CLAUDE ROBERT PAYNE,                          :
                                              :
    Plaintiff,                                :
                                              :            CIVIL ACTION NO.
    v.                                        :            1:11-CV-309-AT
                                              :
STATE FARM FIRE AND CASUALTY                  :
COMPANY; INFINITY SPECIALTY                   :
INSURANCE COMPANY f/k/a                       :
ATLANTA SPECIALTY INSURANCE                   :
COMPANY; LATASHA WILLIAMS;                    :
AND SUE ARENSTEIN, JOINTLY
AND SEVERALLY,

    Defendants.

## ORDER

    Plaintiff Claude Robert Payne originally brought this tort and contract action case in the State Court of Fulton County, Georgia against Atlanta Infinity Specialty Insurance ("Infinity") and State Farm Insurance ("State Farm") for bad faith and negligence in failing to adequately defend Plaintiff and timely settle a third party's claims against Payne within the limits of his insurance policies. The Defendants removed the case to this Court, and State Farm subsequently filed a counter-claim, seeking declaratory judgment relief with respect to the insurance and damages dispute. This matter is now before the Court on three cross-motions for summary judgment.

Plaintiff Claude Robert Payne ("Payne") has filed a Motion for Summary Judgment as to its Claims Against Infinity Specialty Insurance Company [Doc. 67].   Additionally, both Defendant Infinity Specialty Insurance Company ("Infinity") and Defendant State Farm Fire and Casualty Company ("State Farm") have filed their own Motions for Summary Judgment [Docs. 65, 70].  After State Farm filed its motion, it also filed a Notice of Supplemental Authority [Doc. 113]. Payne then filed a Motion to Strike State Farm's Notice of Supplemental Authority [Doc. 114].   Thereafter, Plaintiff also filed notices of supplemental authority [Docs. 118, 120].

For the reasons discussed in length in this Order, Plaintiff's Motion for Summary Judgment is **DENIED**.  Furthermore, Plaintiff's Motion to Strike State Farm's Notice of Supplemental Authority is **DENIED**.   Defendant Infinity's Motion for Summary Judgment is **GRANTED**.  Defendant State Farm's Motion for Summary Judgment is also **GRANTED**.

Infinity [Doc. 63] and State Farm [Doc. 64] have also filed Motion[s] to Strike the Report and Testimony of Gary M. Cooper.   These motions are **DENIED AS MOOT**.

## I.    STANDARD OF REVIEW

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.  The substantive law applicable to the case determines which

facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his favor." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citations and punctuation omitted). The court may not weigh conflicting evidence or make credibility determinations. *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993), *reh'g denied*, 16 F.3d 1233 (11th Cir. 1994) (en banc).

In reviewing cross-motions for summary judgment, the Court considers each motion on its own merits and makes all reasonable inferences in favor of the nonmoving party. *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005); *see Reeves*, 530 U.S. at 150. The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984). "[C]ross-motions may be probative of the non-existence of a factual dispute when . . . they demonstrate a basic agreement concerning what legal theories and material facts are dispositive." *Id.* at 1555-56.

## II.   BACKGROUND[1]

### A.   Payne's Infinity Policy

In June 2006, Defendant Infinity issued an automobile insurance policy on Plaintiff Payne's 1999 Toyota Tacoma Prerunner.   (Infinity's Statement of Material Facts ("ISMF") ¶ 10.)   The policy provided liability coverage from June 23, 2006 to December 23, 2006 for "monetary damages arising from the use of [Payne's] insured automobile," (Compl. ¶ 14; *see also* ISMF ¶ 10), and included a $25,000 per person bodily injury liability limit (ISMF ¶ 11.)   The policy required the policyholder to notify Infinity "of accident or loss within 30 days of how, when, and where the accident or loss happened."   (*Id.* ¶ 12.)   The policy also required the policyholder to send Infinity copies of all legal papers related to the accident and generally cooperate with Infinity's investigation, settlement or defense of claims arising out of the accident.   (*Id.*)   Finally, the policy provided that the policyholder may not bring suit against Infinity for failure to insure if the policyholder breaches any of the policy terms.   (*Id.* ¶ 13.)

On July 1, 2006, Payne was removing trees from his girlfriend's property. (ISMF ¶ 1.)   Payne was uprooting the trees by tying them to his 1999 Toyota Pre Runner and driving the vehicle forward.   (*Id.* ¶ 2.)   At some point, Payne attempted to remove two trees at once.   (*Id.*)   When Payne moved his truck forward, one of the two trees fell to the side and onto a neighbor's mobile home,

---

[1] Unless otherwise specified in this section, all facts as recounted are not in dispute.

killing Herschella Turner.  (*Id.*)  Payne was legally intoxicated for purposes of operating a motor vehicle at the time of the accident.  (*Id.* ¶ 5.)

A few days later, Payne retained the attorney James Hopkins to represent him in connection with criminal charges arising out of the accident.  (*Id.* ¶ 6; Hopkins Dep. 64:13-17.)  Infinity claims that once he was retained, Hopkins advised Payne to review all of his insurance policies and notify his insurance companies about the accident.  (ISMG ¶ 7; Hopkins Dep. 82:5-13.)  However, Payne disputes that Hopkins ever advised him to review any insurance policies, and notes that "the question of insurance did not arise" until far later.  (Pl.'s Resp. ISMF ¶ 7.)  Both parties agree that Payne failed to notify Infinity about the accident.  Payne claims that prior to January 2008, he never considered that his Infinity policy might cover him for civil claims related to the accident.  (Pl.'s Resp. ISMF ¶ 8.)

On November 26, 2007, Stacey Hollomon, one of Turner's four surviving children, brought a wrongful death action against Payne in the State Court of Cobb County, Georgia ("the *Hollomon* Lawsuit").  (*Id.* ¶¶ 14-15.)  Hollomon was represented by the attorney James Neuberger, (*id.* ¶ 16), and Payne retained Hopkins to defend him (*id.* ¶ 17.)  Infinity claims that it was not until January 15, 2008 that it first learned of the accident and subsequent *Hollomon* lawsuit.  (*Id.* ¶ 20.)  Infinity states that Neuberger, Hollomon's attorney, informed the company that an accident had occurred and that a wrongful death lawsuit was in progress when he called to request a copy of Payne's insurance policy.  (*Id.*)

Payne expands on Infinity's account, claiming that he discussed the *Hollomon* Lawsuit "in great detail with representatives of Infinity, including Kristin Hall, who was assigned to defend Payne" in the lawsuit.   (Pl.'s Resp. ISMF ¶ 19.) However, Payne does not deny that Infinity was only notified of the accident and the *Hollomon* Lawsuit on January 15, 2008.  (*Id.* ¶ 20.)

On January 22, 2008, Infinity sent a letter to Payne informing him that it had been notified of the *Hollomon* Lawsuit.  (ISMF ¶ 25; ISMF Ex. K.)  The letter stated that Infinity would handle Payne's claim for coverage under a reservation of rights, noting that Payne had given Infinity late notice of the accident under the terms of the policy and reserving Infinity's right to terminate its defense at any time as a result of this late notice.  (ISMF Ex. K.)  Infinity then assigned Kristen Hall as counsel to defend Payne in the *Hollomon* Lawsuit.  (ISMF ¶ 27.)

On February 19, 2008, Neuberger, Hollomon's attorney, sent a "policy limits settlement demand letter" to Infinity.  (*Id.* ¶ 28.)  The letter demanded that Infinity pay its policy limit of $25,000 on behalf of Payne to settle the *Hollomon* Lawsuit.   (ISMF Ex. M.)   Neuberger also conditioned the demand on the execution of a limited liability release for Payne, and noted that "[a]ny demand on your part for a full release will constitute a counter-offer, and a rejection of this demand."  (*Id.*)  The letter required Infinity to respond to the demand by 3:00 PM on February 29, 2008, after which time the demand would expire.

On February 28, 2008, one day before Neuberger's offer was set to expire, Hall sent Neuberger a letter agreeing to tender Payne's policy limit of $25,000 in

order to settle the case.  (ISMF Ex. N.)  Hall also promised to forward Neuberger a draft of a limited liability release.  (*Id.*)  Next, on March 6, 2008, Hall sent Neuberger an e-mail including the promised release.  (ISMF ¶ 36.)  Hall stated in the e-mail that she would "work with [Neuberger] to reach mutually agreeable language" for the release.  (ISMF Ex. O.)  On March 10, 2008, before receiving a response to her e-mail of March 6, Hall sent a letter to Neuberger purporting to confirm an agreement "to compromise all disputed claims" in the *Hollomon* Lawsuit for $25,000 and a limited liability release.  (ISMF Ex. P.)  Hall enclosed both the release and a check for $25,000 with the letter.  (*Id.*)  The letter stated once again that Hall was "willing to work with [Neuberger] towards a Release that is agreeable."  (*Id.*)

On March 14, 2008, Neuberger responded to Hall's letter with his own proposed limited liability release.  (ISMF ¶ 43.)  The release would have left Payne exposed to liability to Hollomon beyond the $25,000 Infinity policy. However, the release provided that if another of Payne's insurers, namely, State Farm, refused to settle the issue of Payne's liability, and Payne assigned a bad faith claim against State Farm to Hollomon, Hollomon would attempt to collect from State Farm and not from Payne.  (Neuberger Dep. 89:12-90:22.)  After receiving the proposed release, Hall contacted Sean Hynes, a lawyer who had been retained by State Farm to represent Payne in the *Hollomon* Lawsuit, and enclosed a copy of the proposal.  (ISMF ¶ 48.)  Hynes replied that the release

"does not appear to be a proper limited liability release [and] does not release Mr. Payne from any personal exposure." (*Id.* ¶ 49.)

On approximately May 16, 2008, Payne retained the attorney Todd Camp to advise him regarding whether he should file for personal bankruptcy protection. (*Id.* ¶ 51; Pl.'s Resp. ISMF ¶ 51.) Payne gave Camp discretion to determine "what was necessary to enable Payne to obtain a discharge in bankruptcy for any judgment against him on the wrongful death claim." (Pl.'s Resp. ISMF ¶ 52.) Camp was charged with ensuring that the issue of Payne's alleged intoxication at the time of the accident be excluded at trial of the *Hollomon* Lawsuit. (ISMF ¶ 53.) The exclusion of evidence related to Payne's intoxication was necessary in order to ensure that any wrongful death judgment against Payne would be dischargeable in bankruptcy. (State Farm State of Material Facts ("SSMF") ¶ 29.)

When Hall learned that Payne had hired Camp as his bankruptcy attorney, she sent Camp a copy of Neuberger's proposed limited liability release. (*Id.* ¶ 54.) On May 28, 2008, Hall and Camp discussed the proposed release. (*Id.* ¶ 55.) Infinity contends that Camp objected to the proposal because it did not release Payne from liability for all potential claims arising from the accident. (*Id.* ¶ 56; *see also* Hall Dep. 68:17-24, 134:13-20.) Infinity bases its contention in part on a letter from Camp to Hall, in which Camp wrote that Turner's estate "may be a signatory on the limited liability release as well as the wrongful death beneficiaries. . . . In consideration of adding the estate as a signatory we are

willing to transfer any bad faith claim we may have against any insurers." (ISMF Ex. X.) Payne disputes that Camp rejected the proposed release on any grounds, (Pl.'s Resp. ISMF ¶ 56), and states that "the terms of the proposed release were left up to the discretion of Ms. Hall" (*id.* ¶ 54). Payne also disputes Infinity's contention that Camp told Hall to seek a full release of all potential claims arising from the accident. (*Id.* ¶ 57.)

On June 11, 2008, Hall sent Neuberger a new proposed limited liability release. (ISMF ¶ 61.) This newest proposal would have released Payne from any liability for Turner's death and from liability for damages, injuries and expenses arising out of the accident in exchange for an assignment of Payne's bad faith claim. (*Id.*; *see also* ISMF Ex. Y.) Hall asked Neuberger in the letter to review the proposed release and "let me know of any changes you desire." (ISMF Ex. Y.) She also stated that "Infinity's desire is that the Release is mutually agreeable." (*Id.*) Neuberger rejected this proposal, noting it was intended "to obtain a release of the claims held by the estate, which was not part of the settlement demand." (ISMF Ex. Z.) Furthermore, Neuberger construed Hall's newest proposal as a counteroffer to the Hollomon demand, writing that "we do not have a meeting of the minds as to a settlement in this case." (*Id.*) Interpreting Hall's "counteroffer" as a rejection of Hollomon's settlement demand, Neuberger stated that "[w]e will continue to pursue a judgment against Mr. Payne as a result of his negligence in causing the death of Herschella Turner." (*Id.*)

On September 18, 2008, before the *Hollomon* Lawsuit went to trial, Hall sent Neuberger a new letter with a check for $25,000.  (ISMF ¶ 64.)  The new letter accepted the terms of Neuberger's original proposed release and noted that the previous releases Hall had sent to Neuberger "were mere suggestions and were not counters to the agreed upon settlement."  (ISMF Ex. AA.)  Hall noted that Infinity's decision to accept the terms of Neuberger's proposal was "[i]n line with Infinity['s] . . . February 28, 2008 acceptance of Plaintiff's time limit demand for Claude Payne's policy limits."  (*Id.*)  There is no indication in the record that Neuberger ever responded to Hall's September 18 letter, or that he ever cashed the enclosed $25,000 check.

According to Hall, and beginning on February 27, 2009, Camp acted as Payne's "primary . . . lead attorney" in the *Hollomon* Lawsuit.  (Hall Dep. 73:14; *see also id.* 77:4-11, 90:24-25.)  Camp claims that he was representing Payne in the Lawsuit only in his capacity as Payne's bankruptcy attorney, and that his sole concern was excluding any mention of Payne's alleged intoxication at the time of the accident from the trial record.  (Camp Dep. 38:6-18.)

A bench trial was set to take place in the *Hollomon* Lawsuit on June 29, 2009.  (ISMF ¶ 69.)  Hall claims that she discussed the benefits and drawbacks of a bench trial relative to a jury trial with Payne and that Payne and Camp decided a bench trial would better protect Payne's interests.  (Hall Dep. 82:1-11.)  Hall testified that a bench trial was seen as more "expeditious."  (*Id.* 83:1.)  Neuberger claims that before the trial, Camp and Neuberger agreed that Turner's estate

would not pursue any punitive damages claim against Payne. (Neuberger Dep. 127:2-4.) Infinity asserts that Camp and Neuberger also agreed that there would be no in-trial reference to Payne's alleged intoxication at the time of the accident, and "that damages would be in the amount of approximately $3 million." (ISMF ¶ 67; *see also* Hall Dep. 96:1-6.) However, Payne denies that Camp and Neuberger ever stipulated to any damages award, either before or during trial. (Pl.'s Resp. ISMF ¶¶ 67, 70; *see also* Camp Dep. 72:6-74:22, 76:3-11.) Moreover, Neuberger denies that he ever reached an agreement with Camp as to a stipulated judgment in any amount. (Neuberger Dep. 138:16-21; 139:1-4.)

Payne was not present at the *Hollomon* trial because he was hospitalized after attempting suicide days before. (Hall Dep. 13-23.) Payne indicated to Camp that he wanted the trial to proceed in his absence. (*Id.*) Both Hall and Camp were present at the *Hollomon* trial on Payne's behalf. (Camp Dep. 82:19-23.) At trial, neither Hall nor Camp presented any evidence, nor did either attorney raise any objection to Neuberger's statements, evidence or arguments. (Neuberger Dep. 138:7-11; *see also* Hall Dep. 92:2-6, 101:15-19.) Hall has explained that she refrained from presenting evidence or raising objections at trial because she believed "that would have destroyed the agreement that Mr. Camp struck with Neuberger." (Hall Dep. 92:5-6.) Hall claims that Camp instructed her prior to trial to "stipulate to everything," (*id.* at 106:8), including damages (*id.* at 107:21). It was Hall's understanding that Payne's "sole purpose related to [the] bench trial was to be able to discharge all of his debts." (*Id.* at 111:16-18.) Shortly thereafter,

11

on July 1, 2009, judgment was entered against Payne in the amounts of $10.7 million in favor of the plaintiffs and on the wrongful death claim and $3,115,000 in favor of the estate.  (ISMF Ex. BB.)   Hall later expressed that she was "stunned" by the amount of the judgment.  (Hall Dep. 104:10-16.)

Although Hall claims that she reached an agreement with Neuberger on February 28, 2008 to settle the underlying litigation, she never sued to enforce the agreement on behalf of Payne, nor did she ever mention the agreement to the Court before the trial or thereafter.  Hall reasoned that she allowed the case to go to trial in spite of the settlement agreement because "[t]he purpose of a limited liability release is to allow a claimant . . . to settle with one insurance company and pursue other insurance proceeds.  Usually . . . that requires that a case go through the entire process and result in a judgment."  (Hall Dep. 143:2-8.)  At some point after the trial, Hall "closed [the Payne] file."  (Hall Dep. 123:20.)  She therefore could not explain Infinity's subsequent failure to enforce the settlement agreement she had negotiated on Payne's behalf.  (*Id.* 123:20-22.)   After negotiating what she thought to be a settlement agreement with Neuberger, failing to mention this agreement during or after the *Hollomon* trial, sitting silently through the trial, and watching her client get slapped with a $13 million judgment, Hall washed her (and Infinity's) hands of the case.

On July 9, 2009, Infinity sent a letter to Neuberger stating that Infinity had "made repeated full and continuous tender of its policy limits of $25,000 on behalf of [Payne]."  (PSMF Ex. 31.)  Infinity enclosed a new check for $25,000

and stated that tender of the check constituted a fulfillment of Infinity's "duties and obligations under its liability policy with [Payne]." (*Id.*)  However, Infinity never sued to enforce any settlement agreement with Hollomon.

Infinity's Motion for Summary Judgment is now before the Court.  Infinity claims in its motion that Payne's claims against it are barred by his breach of the notice provision in his policy.  Alternatively, Infinity claims that it cannot be held liable for rejecting the Hollomon demand negligently or in bad faith because it in fact accepted the demand under Georgia law.

### B.    Payne's Motion for Summary Judgment

Payne has filed for summary judgment in this case as to his claims against Infinity.  Payne claims that Infinity failed to accept Hollomon's offer to settle the *Hollomon* Lawsuit for the limits of Payne's Infinity policy.  (Payne Mot. Summ. J. at 9.)  Payne claims that Infinity's failure to settle constituted bad faith, or at the very least negligence, since Infinity was well aware that any trial in the underlying litigation would likely expose Payne to a judgment far in excess of Payne's insurance policy limits.  (*Id.* at 16.)

According to Payne's statement of facts, on March 6, 2008, Infinity e-mailed a proposed limited liability release to Neuberger, (PSMF ¶ 12.), followed by a letter on March 10 enclosing a check for $25,000 and the proposed release (PSMF ¶ 13).  On March 14, 2008, Neuberger sent Hall his own proposed release, including language that would have left Payne exposed to liability in the wrongful

13

death lawsuit unless he assigned a potential bad faith claim against State Farm to Hollomon.  (*Id.* ¶ 14; Infinity Resp. PSMF ¶ 14.)

On March 28, 2008, Hall met Payne and advised him to hire a bankruptcy attorney because his assets might be exposed to judgment in the *Hollomon* Lawsuit.  (PSMF ¶ 15.)  Hall had previously written in a letter to Payne that his assets may be exposed because another insurance carrier "may seek recovery against you for any money it pays to Plaintiff."  (Infinity Resp. PSMF ¶ 15.)  After his meeting with Hall, Payne consulted with Camp about the possibility of filing for bankruptcy.  (PSMF ¶ 16.)

On June 11, 2008, Hall sent a letter to Neuberger containing her second proposed limited liability release.  (*Id.* ¶ 18.)  Hall made clear in her letter that "[a]t all times, Infinity's desire is that the Release is mutually agreeable." (Infinity Resp. PSMF ¶ 18.)  In response, Neuberger sent a letter to Hall on July 23, 2008 rejecting her proposal.  (PSMF ¶ 19.)

On September 18, 2008, Hall sent a letter to Neuberger stating that Infinity would "accept the language in [his] original Limited release" and claiming that her previous proposals "were mere suggestions and were not counters to the agreed upon settlement."  (PSMF ¶ 20.)

O July 1, 2009, a judgment was entered against Payne in the *Hollomon* Lawsuit.  (*Id.* ¶ 28.)  The judgment was in the amount of $13,800,000.  (*Id.*)  On July 9, 2009, Infinity sent a letter to Neuberger stating that Infinity had "made repeated full and continuous tender of its policy limits of $25,000 on behalf of

[Payne]." (PSMF Ex. 31.) Infinity enclosed a new check for $25,000 and stated that tender of the check constituted a fulfillment of Infinity's "duties and obligations under its liability policy with [Payne]." (*Id.*)

According to Payne's version of events, however, Infinity never actually accepted Neuberger's demand to settle the wrongful death claim. (ISMF ¶ 32.) Instead, Infinity had rejected the demand by supplying its own limited liability release even after Neuberger sent his proposal to Hall. Payne notes that Infinity never "file[d] a motion to enforce the settlement agreement it claims to have reached on behalf of Payne in the *Hollomon* Litigation." (*Id.* ¶ 33.) By contrast, Infinity asserts that Hall's initial response to Neuberger's demand letter constituted an acceptance of the demand. (Infinity's Resp. ISMF ¶ 32.) Infinity explains its failure to file a motion to enforce the settlement agreement by noting that "no such motion would have been appropriate in the context of a limited liability release . . . since O.C.G.A. § 33-24-41.1 expressly contemplates that an action will continue through judgment even following the execution of a limited liability release and the tender of an insurer's limits." (*Id.* ¶ 33.)

Payne's Motion for Summary Judgment is now before the Court. Payne claims in his motion that Infinity failed to settle Hollomon's claim by rejecting Hollomon's settlement demand and providing its own proposed release. (Pl.'s Br. Support Mot. Summ. J. ("Pl.'s Br.") at 15-16.) Payne argues that Infinity's failure to settle the claim constituted bad faith and negligence given that Payne's liability

in the *Hollomon* Lawsuit "was clear and the damages well-exceeded the policy limits." (*Id.* at 19.)

## III.   DISCUSSION

### A.   Payne's Motion for Summary Judgment

#### i.   Infinity accepted Hollomon's settlement offer and therefore cannot be held liable for rejecting the offer negligently or in bad faith.

Under Georgia law, "[a]n answer to an offer will not amount to an acceptance, so as to result in a contract, unless it is unconditional and identical with the terms of the offer.  To constitute a contract, the offer must be accepted unequivocally and without variance of any sort."  *Herring v. Dunning*, 446 S.E.2d 199, 203 (Ga. Ct. App. 1994) (internal quotations and citations omitted); *see also Auto-Owners Ins. Co. v. Crawford*, 525 S.E.2d 118, 120 (Ga. Ct. App. 1999) (noting that "[a] meeting of the minds is the first requirement of law relative to contracts").   The Georgia courts have held that "a purported acceptance of a settlement offer which imposes conditions or otherwise varies the offer will be construed as a counteroffer to the offer."   *Id.*; *see also Jones v. Frickey*, 618 S.E.2d 29, 31 (Ga. Ct. App. 2005) (citing *Herring*, 446 S.E.2d at 203).   However, where a defendant accepts a plaintiff's settlement offer and subsequently submits a proposed release for the plaintiff's consideration, such submission will not function as a counteroffer if the proposal is intended as a mere suggestion and not as a condition precedent to acceptance of the plaintiff's

demand. *Herring*, 446 S.E.2d at 203. The parties' dispute here revolves around whether Infinity negligently or in bad faith failed to accept the Holloman's settlement demand as a matter of law, given the facts set forth above.

Payne argues that Infinity never accepted Hollomon's settlement demand. (Pl.'s Br. at 11.) According to Payne, the proposed limited liability release that Hall sent to Neuberger constituted one in a series of counteroffers to Hollomon's demand, "a counteroffer that was subsequently rejected by the *Hollomon* plaintiff." (*Id.*) Payne points to two Georgia cases, *Wyatt v. House*, 652 S.E.2d 627 (Ga. Ct. App. 2007), and *Johnson v. Martin*, 235 S.E.2d 728 (Ga. Ct. App. 1977), to prove that a defendant rejects a settlement demand for a limited liability release if the defendant instead seeks a release in full. (*Id.* at 11-12.)

In *Wyatt*, a plaintiff in a lawsuit arising out of an auto accident sent the defendant's insurer a letter demanding payment of the insurer's policy limit and execution of a limited liability release on behalf of the defendant. *Wyatt*, 652 S.E.2d at 630. The insurer responded that it would accept the plaintiff's demand, but that "we feel our insured is better protected with a Release in Full. Please check . . . on . . . allowing us to settle with the Release in Full." *Id.* The insurer also sent the plaintiff a check for the policy limit "to be held in escrow until the . . . Release is signed." *Id.* The plaintiff claimed that the defendant had rejected his demand, and the defendant sued for enforcement. *Id.* The Georgia Court of Appeals held that the insurer's request for a full release constituted a rejection of the plaintiff's demand. *Id.* The court reasoned that the insurer in

*Wyatt* clearly "required a signed full release . . . before the case would settle. [The insurer's] response to [the plaintiff's] offer required an additional act necessary to accept [the plaintiff's] offer to settle for the policy limits — a full release from [the plaintiff] rather than the limited release [plaintiff's counsel] had proposed." *Id.*

Similarly, in *Johnson*, plaintiff's counsel contacted the defendant with an offer to settle a personal injury lawsuit for the full limits of the defendant's insurance policy. *Johnson*, 235 S.E.2d at 728. The defendant's attorney responded by purporting to accept the offer but also enclosing a full release of all claims against the defendant which the attorney asked the plaintiff to sign before presenting the settlement for payment. *Id.* at 729. The Georgia Court of Appeals held that the defendant had rejected the plaintiff's settlement offer. *Id.* at 729. The Court noted that the intent of the defendant's attorney was clearly "to qualify his acceptance of the offer by adding as a condition to the agreement the signing of the release by plaintiff." *Id.*

In its response to Payne's motion, Infinity argues that the legal principles identified in *Herring v. Dunning*, 446 S.E.2d 199 (Ga. Ct. App. 1994) are controlling here. In *Herring*, the plaintiff's attorney contacted the defendant's attorney with an offer to settle a case arising out of an automobile accident. *Id.* at 201. The settlement offer was for the limits of the defendant's insurance policy. *Id.* Later, the defendant's attorney wrote the plaintiff's attorney to confirm a telephone discussion between the two parties during which the plaintiff's

attorney "had extended an oral amended offer to settle the case for the policy limits in return for a release of [the defendant] from any and all liability." *Id.* The next day, the defendant wrote the plaintiff "to accept your offer to settle the above-referenced case . . . for the policy limits . . . in exchange for a full and final release." *Id.* The defendant's attorneys then sent the plaintiff a proposed release, to which the plaintiff's attorney objected. *Id.* The defendant's attorney revised the release to remove the objectionable language, but the plaintiff once again refused to accept the release, this time because the plaintiff had only agreed to release the defendant within a specific time limit, which had expired between the drafting of the first and second proposed release. *Id.* The defendant subsequently sued for enforcement of the settlement agreement.

The Georgia Court of Appeals held that the *Herring* defendant had accepted the plaintiff's settlement offer within the prescribed time period. *Id.* at 203. The court explained that "[a]n offer may be accepted . . . either by a promise to do the thing contemplated therein, or by the actual doing of the thing." *Id.* The plaintiff's offer in *Herring* "contained no specified manner of acceptance, [so] defendant's counsel was entitled to accept by mailing the insurer's promise to pay the policy limits in exchange for a full release of its insured." *Id.* The defendant's subsequent proposal regarding the language of the release "[did] not render such acceptance a counteroffer which reject[ed] the plaintiff's offer. Rather, [the acceptance was valid] with the suggested choice for terminating the controversy being merely precatory." *Id.*; *see also id.* ("Precatory words are

words whose ordinary significance imports entreaty, recommendation, or expectation rather than any mandatory direction." (quoting *Raines v. Duskin*, 277 S.E.2d 26, 34 (Ga. 1981)) (internal quotations omitted)).

More recent decisions from the Georgia Court of Appeals have relied on *Herring* in holding that a defendant's failure to present a plaintiff with an acceptable liability release prior to a settlement deadline does not vitiate that defendant's prior acceptance of a plaintiff's settlement offer.  In *Moreno v. Strickland*, 567 S.E.2d 90, 91 (Ga. Ct. App. 2002), a plaintiff sued for damages after being injured while riding his motorcycle and colliding with the defendant's truck.  *Id.*  On June 22, 2000, the plaintiff's attorney contacted the defendant's attorney with an offer to settle the lawsuit for the defendant's insurance policy limits plus certain "release language." *Id.*  The offer to settle expired on July 21, 2000.  *Id.*  On July 18, 2000, the two attorneys spoke by phone, after which the defendant's attorney made the following notation in his records: "7/18/2000, telephone conference with Plaintiff's attorney. I agreed to settle with indemnification language out of release, will pay bond premium. He said, no problem, I'm waiting on affidavit from Defendant." *Id.*  However, on July 26, 2000, the plaintiff's attorney wrote to confirm that the settlement offer had in fact not been accepted.  *Id.*  The defendant's attorney responded that he had accepted the offer during the July 18 phone conversation and was only waiting to receive a signed affidavit from his client before sending the plaintiff a draft release.  *Id.*  The plaintiff's attorney maintained that there could be no settlement

agreement before the defendant submitted a draft release for the plaintiff's review.  *Id.* at 92.  Since the release was submitted after the deadline in the plaintiff's demand letter, the plaintiff's attorney contended that there had been no agreement to settle.  *Id.*

The Georgia Court of Appeals held that the defendant's attorney had accepted the settlement offer.  *Id.* at 93.  The court reasoned that the plaintiff's offer "did not include the requirement that he receive the affidavit and release before the time limit expired, and his statement that he 'could not agree to settlement without seeing' the papers reveals his misapprehension of the process."  *Id.*  Quoting *Herring*, the court held that "the presentation of a proper release in a form acceptable to plaintiff may have been a condition of defendant's performance but it was not an act necessary to acceptance of plaintiff's offer to settle for the policy limits."[2]  *Id.*   As a result, the failure of the parties to agree on release language prior to the expiration of the settlement deadline did not vitiate the defendant's acceptance of the settlement offer prior to the deadline.

Similarly, in *Smith v. Hall*, 714 S.E.2d 742 (Ga. Ct. App. 2011), the plaintiff's attorney in a personal injury case sent the defendant's attorney a

---

[2] The *Moreno* court's citation of *Herring* in this instance indicates that *Herring*'s reasoning applies even in cases where a plaintiff's settlement offer conditions settlement on execution of a liability release where the defendant unequivocally accepts the plaintiff's order.  In *Moreno*, unlike in *Herring*, the plaintiff demanded a release in order to settle the underlying lawsuit.  Still, the *Moreno* court held that "presentation of a proper release" was not necessary in order for the defendant to accept the plaintiff's offer because "'the presentation of a proper release in a form acceptable to plaintiff may have been a condition of defendant's performance but it was not an act necessary to acceptance of plaintiff's offer to settle for the policy limits.'" *Moreno*, 255 S.E.2d at 93, citing *Herring*, 446 S.E.2d. at 199.

demand letter offering to settle the case in exchange for the defendant's insurance policy limits.  *Id.* at 742.  The letter stated that "[a]ny deviation or delay in this acceptance will be considered an automatic rejection of this demand," and noted that the offer would expire on July 14, 2010.  *Id.*  Before the offer expired, defendant's counsel wrote to plaintiff's counsel that "[w]e hereby accept your demand for settlement" and included a check for the defendant's policy limits in the letter.  *Id.* at 743.  The letter also included a release and indemnity agreement, which the defendant's attorney explained was being offered based on the assumption that "there are no other parties or available insurance policies from which your client could collect any potential judgment for his damages."  *Id.*  The attorney explained that in the event there existed other insurance policies from which the plaintiff might collect judgment, the defendant would discuss terms of a potential limited liability release.  *Id.*  Plaintiff's counsel returned the check and release, claiming that they amounted to a counteroffer and rejection of the plaintiff's settlement offer because the defendant's "purported acceptance included a release that sought to release parties other than [the defendant], and thus attempted to broaden the scope of the method necessary to terminate the lawsuit."  *Id.*

The court held that the defendant had accepted the plaintiff's settlement offer.  The court noted that like the attorney in *Herring*, the defendant's attorney in the case at issue "unequivocally accepted the offer to settle when he wrote '[w]e hereby accept your demand for settlement.'"  *Id.* at 744.  The release the

defendant's attorney included in his letter to plaintiff's counsel was therefore "merely a suggestion of how to terminate the lawsuit, as indicated by his writing that [he was willing to discuss terms of a potential limited liability release." *Id.* Quoting the same language from *Herring* that the *Moreno* court had seized upon, the Georgia Court of Appeals wrote that "[t]he presentation of a proper release in a form acceptable to plaintiff may have been a condition of defendant's performance but it was not an act necessary to acceptance of plaintiff's offer to settle for the policy limits." *Id.* (quoting *Moreno*, 567 S.E.2d at 93).

Like defendants' counsel in *Smith* and *Moreno*, Hall accepted Neuberger's settlement offer prior to the expiration of the settlement deadline. On February 28, 2008, one day before the expiration of Neuberger's settlement offer, Hall sent a letter to Neuberger stating that "Infinity . . . tenders the maximum available to Plaintiff under Mr. Payne's Infinity policy . . . to compromise Plaintiff's wrongful death claim." (ISMF Ex. N.) Hall also promised that once she received a check made payable to the *Hollomon* plaintiff, she would send Neuberger a "draft of a limited liability release." (*Id.*) For his part, Neuberger never submitted mandatory release language in his demand letter, stating only that his demand was being made "conditioned upon the execution of a limited liability release in favor of Mr. Payne." (ISMF Ex. M.) His offer letter noted that "[a]ny *demand* on your part for a full release will constitute a counter-offer, and a rejection of this demand." (*Id.* (emphasis added)). Hall's February 28 letter included no such

23

demand.  Instead, her letter functioned as an acceptance of Neuberger's offer to settle the *Hollomon* Lawsuit.

Indeed, even in her subsequent communications with Neuberger regarding the settlement, Hall never demanded a release in full, or even release language of any kind.  In a March 10, 2008 letter to Neuberger, in which she enclosed a proposed limited liability release, Hall assured Neuberger that she was "willing to work with [Neuberger] towards a Release that is agreeable."  (ISMF Ex. P.) Neuberger then submitted his own proposed release and Hall responded with yet another draft, again noting that "[a]t all times, Infinity's desire is that the Release is mutually agreeable."  (*Id.* Ex. Y.)  Like the defendant's counsel's suggestions in *Herring*, Hall's proposals were merely precatory: they were intended as "entreat[ies or] recommendation[s] . . . rather than [as] mandatory direction[s]." *Herring*, 446 S.E.2d at 203.   At all times during her correspondence with Neuberger, Hall made clear that she was merely proposing language for the release, and that she desired to work with Neuberger to craft a release to which he would have no objection.  As in *Herring*, "the presentation of a proper release in a form acceptable to plaintiff may have been a condition of defendant's performance but it was not an act necessary to acceptance of plaintiff's offer to settle for the policy limits." *Id.*

Payne objects that Hall's various release proposals indicated a counteroffer to Hollomon's demand because "Infinity tried to vary the terms of the proposed releases to release more parties and more claims than offered by the *Hollomon*

plaintiff." (Pl.'s Reply Supp. Mot. Summ. J. at 4.) In support of his argument, Payne points to *Johnson*, where the Georgia Court of Appeals held that the defendant had rejected the plaintiff's settlement demand because the defendant's proposed release was "much broader in scope than the action against the[] two defendants." *Johnson*, 235 S.E.2d at 729. Here too, Payne claims, Infinity varied the terms the Hollomon demand by proposing a release that would have released Payne and Infinity "from claims for property damage, funeral expenses, and medical expenses, which damages were not included in the demand and which claims were held by the estate of Ms. Turner, not Ms. Hollomon." (Pl.'s Br. Supp. Mot. Summ. J. at 13.) Payne contends that any suggestion proposing to release Payne from claims not held by Hollomon constituted a variance from, and therefore a counteroffer to, the terms of the demand as stated by Neuberger.

Payne's argument is unavailing. Defendant's counsel in *Johnson* gave no indication that his proposed release was anything but a "mandatory direction" to the plaintiff. *Johnson*, 235 S.E.2d at 729 (noting that defendant's attorney had enclosed a release in his response to plaintiff's demand and written only that it was a "release of all claims which we would appreciate your having [the plaintiff] sign"). The court in *Johnson* stated that the defendant's attorney "[c]learly inten[ded] . . . to qualify his acceptance of the offer by adding as a condition to the agreement the signing of the release by plaintiff." *Id.* No such intent is clear or even indicated in this case. Indeed, plaintiff's counsel attempted to raise the same argument in *Smith* as Payne raises here, claiming that the parties failed to

25

agree on settlement "because [defendant's] purported acceptance included a release that sought to release parties other than [defendant], and thus attempted to broaden the scope of the method necessary to terminate the lawsuit." *Smith*, 714 S.E.2d at 743.   In response, the Georgia Court of Appeals held that the defendant had accepted the plaintiff's offer, noting that the defendant's draft liability release was merely a suggestion as to how the parties should terminate the lawsuit.  *Id.*  The same is true in this case: Hall accepted Neuberger's offer on February 28, 2008.   Each proposed release she submitted subsequently functioned merely as a suggestion to Neuberger, and certainly not as a "mandatory element" to settlement.  *Id.*[3]

All this is not to say that Hall's and Infinity's conduct in the underlying litigation was beyond reproach.  Hall responded to Neuberger's demand letter on February 28, 2008.   In the following months, she proceeded to engage in numerous exchanges with Neuberger regarding the semantics of a limited liability release to be executed in favor of Payne.  On July 23, 2008, nearly five months after she sent Neuberger her acceptance letter, Hall received a letter from Neuberger stating that "we do not have a meeting of the minds as to a settlement in this case." (ISMF Ex. Z.)  The letter went on to claim that "[m]y client hereby rejects your counteroffer."  (*Id.*)  At this point, the record is silent as to what

---

[3] Payne has submitted a Notice of Supplemental Authority since filing his Motion for Summary Judgment.  In his notice, Payne points to the Georgia Court of Appeals' recent decision in *Torres v. Elkin*, No. A12A0278 (Ga. Ct. App. July 12, 2012).  In *Torres*, the defendant's attorney in an underlying lawsuit rejected the plaintiff's settlement demand and instead conditioned settlement on the plaintiff's acceptance of an additional term the defendant included in its counteroffer.  *Id.* at *4.  Since no such counteroffer was made in this case, Payne's citation to *Torres* is inapposite.

action, if any, Hall took in response to Neuberger's assertions.  If she believed her client had already accepted Hollomon's settlement offer on February 28, 2008, why did she not respond to Neuberger accordingly?  It is true that Hall sent a letter to Neuberger on September 18, 2008, stating that Infinity would accept the limited liability release Neuberger had proposed on March 14, 2008.  However, there is no indication in the record that Hall ever followed up on that letter, either prior to or during trial of the *Hollomon* Lawsuit.

Moreover, even following trial in the Lawsuit, Hall never mentioned the fact that Payne had accepted Hollomon's settlement demand or that the parties had come to an agreement regarding the language of a limited liability release. Hall never mentioned the settlement to the trial judge at or before the bench trial, and she never sued to enforce the agreement after trial.  (Hall Dep. 143: 23-25.) Hall claims that any such suit "wasn't necessary," (Hall Dep. 143:25), but the facts of this case indicate otherwise.  Notably, enforcement of the settlement agreement would have capped Payne's personal liability to Hollomon at the limits of his Infinity insurance policy back in 2008 without further ado.  Hall's silence at the trial and her failure to raise the issue of a settlement agreement subsequently are baffling.

Nevertheless, the question before the Court is not whether Hall should have sued to enforce the settlement agreement or whether she should have spoken up during trial instead of stipulating to Neuberger's evidence and arguments.  Rather, the question before the Court, as posed by Payne in his

Motion for Summary Judgment, is whether Infinity acted negligently or in bad faith by failing to accept Hollomon's settlement offer.  This question demands that the Court consider whether Hall on behalf of Infinity in fact accepted Hollomon's offer before that offer expired.  And in spite of her myriad foibles as Payne's attorney or Infinity's gamesmanship, Hall did render such acceptance on Infinity's behalf under Georgia law.  Accordingly, Payne's Motion for Summary Judgment against Infinity for failing to accept the Hollomon settlement offer negligently or in bad faith must be **DENIED**.

### B.    Infinity's Motion for Summary Judgment

#### i.    Payne's bad faith claim is not barred by the notice provision in his Infinity policy because Infinity waived the provision.

Infinity has filed a cross-motion for summary judgment, claiming that Payne's bad faith claim is barred because he failed to report the accident or the claim for more than 18 months.   (Infinity Br. Supp. Mot. Summ. J. at 10.) Payne's Infinity policy provided that the insured must notify Infinity within 30 days of any accident.   (*Id.* at 11.)   In Georgia, "provisions and conditions precedent to recovery under [an insurance policy,] . . . unless contrary to public policy, are waived where the insurer has [led] the insured to believe that the insured will be paid without suit by its actions in negotiating for settlement or direct promises to pay."   *U.S. Fidelity & Guaranty Co. v. Lockhart*, 186 S.E.2d 362, 363 (Ga. Ct. App. 1971).   "[P]ayment by the insurer with knowledge of the pertinent circumstances giving it a policy defense waives its right to rely thereon."

*Sargent v. Allstate Ins. Co.*, 303 S.E.2d 43, 47 (Ga. Ct. App. 1983) (internal quotations omitted).

There is no dispute in this case that Hall tendered payment of Payne's policy limits by enclosing a check for $25,000 in her September 18, 2008 letter to Neuberger.   Infinity only agreed to represent Payne in the first place under a reservation of rights as a result of Payne's late notice.   However, Infinity's payment indicates waiver of the policy's notice provision under Georgia law. Accordingly, Payne's bad faith claim is not barred.

> ### ii.   However, Infinity cannot be held liable for rejecting the Hollomon demand in negligently or in bad faith because Infinity accepted the demand under Georgia law.

Infinity has also moved for summary judgment on the ground that its acceptance of Hollomon's settlement demand precludes bad faith liability. (Infinity Br. Supp. Mot. Summ. J. at 14.)   As the Court explained in considering Payne's motion for summary judgment, Infinity accepted Hollomon's settlement demand under Georgia law.   *Infra* pp. 13-19.   Based on the undisputed facts in this case, Infinity therefore could not be liable to Payne for rejecting the Hollomon demand negligently or in bad faith.   Accordingly, Infinity's Motion for Summary Judgment is **GRANTED**.

### C.    State Farm's Motion for Summary Judgment.

#### i.    Payne's State Farm policy

At the time of the July 1, 2006 accident, Payne was also insured under a State Farm homeowners insurance policy.  (SSMF ¶ 13.)   The policy covered Payne for personal liability.  (*Id.* ¶ 15.)  The policy also provided that, in the event of an accident, the insured was obligated to notify State Farm "as soon as practicable" regarding the circumstances of the accident and to "immediately forward" to State Farm "every notice, demand, summons or other process relating to the accident."  (SSMF ¶ 34.)  The policy excluded from coverage claims of "bodily injury or property damage arising out of the . . . use . . . of . . . a motor vehicle owned or operated by . . . any insured."  (SSMF ¶ 36.)

Payne did not notify State Farm about the July 1 accident until January 24, 2008.  (*Id.* ¶ 19.)  However, Payne notes that State Farm's claims log indicates the insurer was aware of the accident on July 1, 2006.  (Payne's Resp. SSMF ¶ 19.) After Payne informed State Farm about the accident and the *Hollomon* Lawsuit, the insurer retained Sean Hynes as counsel to represent Payne.  (SSMF ¶ 22.)  On February 14, 2008, State Farm also sent a letter to Payne reserving its right to refuse to provide liability coverage, in part because it appeared that Payne had failed to comply with his policy's requirements for timely notification of loss. (State Farm App. ("App.") at 3-4.)   Payne asserts that his attorney, James Hopkins, never advised him to review his insurance policies to determine whether he might have been covered for personal liability arising out of the

accident, nor did any attorney subsequently advise Payne of this possibility until January 2008.  (Payne Resp. SSMF ¶ 19.)

On June 10, 2008, State Farm sent Payne a letter informing him that his homeowners insurance policy did not cover him for liability stemming from the July 1, 2006 accident.  (App. 21 at 2.)  The letter explained that Payne had failed to notify State Farm about the accident "as soon as practicable," as was required by the terms of the policy.  (*Id.* at 3.)  Additionally, State Farm wrote that even had Payne notified State Farm about the accident in a timely manner, the policy would not have provided liability coverage because the accident did not qualify as an "occurrence" covered under the policy.  (*Id.*)  The policy defines an occurrence as "an accident . . . which results in . . . bodily injury; or  . . . property damage." (*Id.*)  The letter did not provide any further explanation as to why the accident did not qualify as an "occurrence" under the policy.  Soon after State Farm sent its denial letter, Hynes ceased representing Payne in the *Hollomon* Lawsuit. (SSMF ¶¶ 25-26.)

State Farm's Motion for Summary Judgment is now before the Court.  Like Infinity, State Farm claims that Payne's claims in this case are barred by his breach of the notice provision in his State Farm policy.  Alternatively, State Farm argues that Payne's claims are barred by the policy provision excluding from coverage accidents arising from the "use" of motor vehicles.

### ii.   Payne's claim against State Farm is not barred by the "motor vehicle exclusion" in his insurance policy.

State Farm has also argued that all of Payne's claims are barred by a provision in his policy addressing exclusions from coverage.   The relevant provision reads as follows:

Section II — Exclusions

  2.   Coverage L [personal liability] and Coverage M [medical payment to others] do not apply to: . .

  e. bodily injury or property damage arising out of the ownership, maintenance, use, loading or unloading of:

  (2) a motor vehicle owned or operated by or rented or loaned to any insured.

(State Farm Br. Supp. Mot. Summ. J. at 21) (second alteration in original).

State Farm points out that the Georgia courts have consistently applied a but-for test in determining whether an accident "arose out of" the use of a motor vehicle. *Jacobs v. American Interstate Ins. Co.*, 549 S.E.2d 767, 767-68 (Ga. Ct. App. 2001) (holding that a motor vehicle exclusion barred a claim for insurance coverage where the insured was towing a logging skidder behind a tractor-trailer and the skidder struck an oncoming car); *see also id.* at 768 (reasoning that "the skidder would not have made contact with the truck but for the fact it was being transported by [the insured's] tractor-trailer" and that "[t]he collision and resulting injuries clearly flowed from [the insured's] 'use' of the tractor-trailer as contemplated by the 'auto' exclusion").   Since the July 1, 2006 accident would not have occurred but for Payne's use of his truck, State Farm argues that Payne's

claims for coverage are barred under Georgia law by the motor vehicle exclusion in his insurance policy.

State Farm submitted briefing on its Motion for Summary Judgment on January 17, 2012.  On February 27, 2012, State Farm submitted a Notice of Supplemental Authority.   In its notice, State Farm cites a Georgia Court of Appeals decision handed down on February 14, 2012 that it contends is on point with the facts at issue here.  In *Hays v. Georgia Farm Bureau Mutual Insurance Co.*, 722 S.E.2d 923 (Ga. Ct. App. 2012), the court, faced with an automobile exclusion provision identical to the one at issue in this case, considered three factors in holding that a vehicle was "in use" at the time of an accident: "(1) the physical proximity of the injury site to the vehicle; (2) the nature of the conduct which caused the situation of jeopardy; and (3) whether the vehicle was being utilized in the plain sense of the word."  *Id.*  (quoting *Old Republic Union Ins. Co. v. Floyd Beasley & Sons, Inc.*, 551 S.E.2d 388, 391 (Ga. Ct. App. 2001)) (internal quotation marks omitted).[4]

---

[4] In *Hays*, two hunters were attempting to lift a portable toilet onto a deer stand.  *Hays v. Georgia Farm Bureau Mutual Insurance Co.*, 722 S.E.2d 923, 925 (Ga. Ct. App. 2012).  One of the hunters attached a rope to the toilet and pulled the rope through a pulley on top of the deer stand.  *Id.*  The hunter then attached the rope to the back of his pickup truck.  *Id.*  The other hunter climbed on top of the deer stand.  *Id.*  When the driver pulled his truck forward, the stand fell to the ground, injuring the hunter who was standing on it at the time.  *Id.*

   The injured hunter sued the driver, who was insured under a homeowner's policy similar to the one at issue in this case.  The policy contained a provision excluding from coverage accidents arising from the "use . . . of a motor vehicle."  *Id.*  The Georgia Court of Appeals held that the driver was not covered for claims arising from the accident because his truck was "in use" when the hunter was injured.  *Id.* at 926.  The court reasoned that the term "use" has been defined in Georgia as "to employ for some purpose."  *Id.* (quoting *Lancer Ins. Co. v. United Nat'l Ins. Co.*, 668 S.E.2d 865, 867 (Ga. Ct. App. 2008)).

Payne filed a Motion to Strike State Farm's Notice of Supplemental Authority, claiming that the notice is prohibited by the same legal authority excluding sur-reply briefs from consideration.   (Pl.'s Mot. Strike Notice Supplemental Authority ("Mot. Strike") at 2.)   However, Payne's argument is unavailing.   It is well established in this Circuit that "filing notices of supplemental authorities that come to a party's attention after briefing is complete is [acceptable]." *Horner, Townsend & Kent, Inc. v. Hamilton*, No. C. A. 1:01-CV-2979-JEC, 2004 WL 2284503, *11 (N.D. Ga. Sept. 30, 2004). ).   "[S]uch [filing] is helpful to the Court, which of course always endeavors to apply current authority in resolving the issues before it." *Id.*   In this case, State Farm completed briefing on its Motion for Summary Judgment on January 17, 2012. State Farm's Notice of Supplemental Authority cites a Georgia Court of Appeals decision handed down on February 14, 2012, almost a month after briefing was completed.   State Farm's notice is therefore warranted in this case.   Accordingly, Payne's Motion to Strike State Farm's Notice is **DENIED**.

Although *Hays* may help to shed light on whether Payne's truck was "in use" at the time of the accident, Payne objects that the issue of automobile use is irrelevant here because State Farm waived the "automobile use" exclusion prior to the start of this litigation.   Specifically, Payne claims that State Farm may not assert the exclusion as a defense to coverage in this case because "[a]t no time until the filing of its Motion for Summary Judgment did [State Farm] even hint that its denial of coverage was based on the Exclusion."   (Pl.'s Resp. State Farm

Mot. Summ. J. at 13.)   In its reservation-of-rights letter to Payne, State Farm wrote that it reserved its right to "deny defense or indemnity to [Payne]" for reasons including late notice "and for other reasons which may become known." (SSMF App. 19.)   However, in its subsequent denial letter, State Farm never mentioned anything about a motor vehicle exclusion, stating only that Payne had failed to provide State Farm with timely notice of the accident and that the accident itself did not qualify as an "occurrence" that would be covered under the State Farm policy.   Payne argues that under Georgia law, State Farm cannot raise a defense to coverage at the summary judgment stage that was not specifically enumerated in its denial letter.

In support of his position, Payne points to the Supreme Court of Georgia's recent decision in *Hoover v. Maxum Indemnity Co.*, -- S.E.2D --, Nos. S11G1681, S11G1683, 2012 WL 3031345 (Ga. June 18, 2012).   In *Hoover*, the court held that an insurer cannot deny a claim on one ground and, at the same time, reserve its right to base its denial on another unspecified ground in the future.   *Id.* at *3 (holding as a result that the insurer could not raise a new notice defense to coverage in a declaratory judgment action against its insured).   The court found that the insurer in *Hoover* had "failed to properly reserve its rights to assert a notice defense when it denied [the] claim on the grounds of [a liability exclusion] and refused to undertake a defense."   *Id.*   Any disclaimer the insurer included in its denial letter purporting to reserve a right to base the denial on other grounds in the future was not a proper reservation of rights; under Georgia law, a

reservation of rights can only be asserted prior to, and not concurrent with, a denial. *Id.*; *see also World Harvest Church, Inc. v. Guideone Mut. Ins. Co.*, 695 S.E.2d 6, 10 (Ga. 2010) (holding that, "[a]t a minimum, the reservation of rights must fairly inform the insured that, notwithstanding [the insurer's] defense of the action, it disclaims liability and does not waive the defenses available to it against the insured" (internal quotations omitted) (alteration in original)); *Hoover*, 2012 WL 3031345, at *3 (concluding based on *World Harvest Church, Inc.* that "a reservation of rights is only available to an insurer who undertakes a defense while questions remain about the validity of the coverage").

State Farm responds by attempting to limit *Hoover* to its facts. First, unlike the insurer in *Hoover*, State Farm notes that it did not deny Payne's claim initially. (State Farm Resp. Pl.'s Notice Supp. Authority at 4.) Instead, State Farm agreed to defend Payne under a proper reservation of rights, and only later sent Payne its denial letter. (*Id.*) Additionally, unlike the insurer in *Hoover*, State Farm raised the motor vehicle exclusion in its Answer and Counterclaim to Payne's Complaint, as well as in its Motion for Summary Judgment. (*Id.*) Finally, State Farm argues that, even after *Hoover*, insurers who decline to defend an insured do not waive their right to assert defenses to an insured's future bad faith suit. (*Id.* at 5.) State Farm implies that it is simply defending a

bad faith suit based on the motor vehicle exclusion, rather than asserting it affirmatively as a defense to coverage in an action of its own.[5]

State Farm's arguments are simply red herrings. The court in *Hoover* was not concerned with whether the insurer's denial letter was preceded by a letter agreeing to defend under a reservation of rights, nor did it care that the insurer raised a new defense to coverage in its answer to the instant complaint before abandoning that defense in its motion for summary judgment. Rather, the *Hoover* court held simply that, when an insurer sends a denial letter, it must specify the reasons for its denial of coverage within that letter and cannot reserve its right to assert further unspecified defenses in the future. State Farm is correct that *Hoover* does not preclude an insurer from defending itself against a future bad faith suit. However, *Hoover* does preclude an insurer from defending itself against such a suit by raising defenses to coverage that it did not assert in its denial letter.

The court's holding in *Hoover* is therefore squarely applicable to the facts of this case. In its June 10, 2008 denial letter, State Farm never mentioned anything about denying coverage to Payne based on a motor vehicle exclusion in Payne's insurance policy. Instead, State Farm raised this defense for the first time in this litigation. Even if State Farm's denial letter included a purported

---

[5] State Farm also asserts that *Hoover* is distinguishable because, unlike the insurer in *Hoover*, "State Farm did not assert, only to later drop, the motor vehicle exclusion as a defense to coverage." (State Farm Resp. Pl.'s Notice Supp. Authority at 4.) However, the fact that the insurer in *Hoover* cited one policy provision in its answer to the plaintiff's complaint and then ignored the provision in its motion for summary judgment had no bearing on the *Hoover* court's holding; the court simply held that an insurer cannot use a denial letter to reserve its right to assert an unspecified defense to coverage in the future.

"reservation of rights," such a reservation was not proper under Georgia law. Indeed, *Hoover* made clear that "the standard and acceptable procedure for an insurer to determine its rights is to *agree to defend* under a reservation of rights and then file a declaratory judgment action." *Hoover*, 2012 WL 3031345, at *3 (citing *Richmond*, 231 S.E.2d at 247-48). Since State Farm made no mention of the motor vehicle exclusion in its denial letter, it cannot properly assert the exclusion as a defense to coverage in this lawsuit. Accordingly, Payne's claim is not barred by the motor vehicle exclusion in his State Farm policy.

### iii.     Payne's claim is nonetheless barred by the notice provision in his State Farm policy.

It is well established in Georgia that notice provisions in insurance policies are valid, and that breach of a notice provision can result in forfeiture of coverage. *See, e.g.*, *Forshee v. Employers Mut. Cas. Co.*, 711 S.E.2d 28, 31 (Ga. Ct. App. 2011) ("It is settled under Georgia law that, when an insurance policy includes a notice requirement as a condition precedent to coverage, and when the insured unreasonably fails to timely comply with the notice requirement, the insurer is not obligated to provide a defense or coverage."); *Lankford v. State Farm Mut. Auto. Ins. Co.*, 703 S.E.2d 436, 439 (Ga. Ct. App. 2010); *Federated Mut. Ins. Co. v. Ownbey Enterprises, Inc.*, 627 S.E.2d 917, 919 (Ga. Ct. App. 2006); *Richmond v. Ga. Farm Bureau Mut. Ins. Co.*, 231 S.E.2d 245, 249 (Ga. Ct. App. 1976) (holding that "[i]nsurance is a matter of contract and the parties are bound by the terms of the policy"). "The purpose of the notice provision in an

insurance policy is to enable an insurer to investigate promptly the facts surrounding the occurrence while they are still fresh and the witnesses are still available . . . ." *Richmond*, 231 S.E.2d at 250.  Where an insured has failed to provide justification for his breach of a notice provision, and where the insurer has not waived its right to deny coverage in the event of a breach, "the insurer is not obligated to provide either a defense or coverage."  *Id.*

The notice provision applicable in this case states as follows:

Section II — Conditions

3. Duties After Loss.  In case of an accident or occurrence the insured shall perform the following duties that apply.  You shall cooperate with us in seeing that these duties are performed:

a. give written notice to us or our agent as soon as practicable, which sets forth:

(1) the identity of this policy and insured;

(2) reasonably available information on the time, place and circumstances of the accident or occurrence; and

(3) names and addresses of any claimants and available witnesses;

b. immediately forward to us every notice, demand, summons or other process relating to the accident or occurrence; . . .

6. Suit Against Us.  No action shall be brought against us unless there has been compliance with the policy provisions.

(State Farm Br. Supp. Mot. Summ. J. at 12-13.)

There is no dispute that Payne waited until January 2008 to notify State Farm about the accident, 18 months after the accident took place. State Farm contends that Payne's delay was unreasonable under Georgia law. In *Allstate Insurance Co. v. Walker*, 562 S.E.2d 267 (Ga. Ct. App. 2002), State Farm notes that the Georgia Court of Appeals held that an almost one-year delay in notifying an insurer of an occurrence was not justified even though the insured claimed that they did not realize their policy would cover their claim. *Id.* at 15. The court wrote that "[t]he law requires more than just ignorance, or even misplaced confidence, to avoid the terms of a valid contract." *Walker*, 562 S.E.2d at 268 (quoting *Protective Ins. Co. v. Johnson*, 352 S.E.2d 760, 761 (Ga. 1987)) (internal quotations omitted); *see also Snow v. Atlanta Int'l Ins. Co.*, 354 S.E.2d 644, 645 (Ga. Ct. App. 1987) (holding that a delay in notice of 10 months from the time of an accident and 6 months from the filing of a lawsuit was unreasonable as a matter of law even though the insured claimed he did not know that he had applicable insurance coverage); *Int'l Indemnity Co. v. Smith*, 342 S.E.2d 4, 4 (Ga. Ct. App. 1986) (holding that ignorance is not a defense to breach of a notice provision in an insurance policy)

Under Georgia law, an insurer cannot deny coverage for failure to provide timely notice of an accident if the insured's failure to provide such notice was justified. In *Forshee v. Employers Mutual Causalty Co.*, 711 S.E.2d 28 (Ga. Ct. App. 2011), the Georgia Court of Appeals held that "it is the nature and circumstances of 'the accident' or 'the incident' and the immediate conclusions an

ordinarily prudent and reasonable person would draw therefrom that determine whether an insured has reasonably justified his decision not to notify the insurer." *Id.* at 31. The *Forshee* court defined such relevant circumstances as the nature of the incident in question and the degree to which a reasonable person would realize that damage or injury had occurred. *Id.* "[A] trial court must make every effort to eliminate the distorting effects of hindsight and to evaluate the conduct of the insured from the perspective of a reasonable person in the same circumstances as those in which the insured found himself." *Id.* at 32.

The issue of whether a claimant acted reasonably in failing to provide timely notice of an accident to his insurer is generally a question of fact. *See, e.g.*, *State Farm Fire & Cas. Co. v. Walnut Ave. Partners, LLC*, 675 S.E.2d 534, 538 (Ga. Ct. App. 2009) (holding that the question of "[w]hether an insured gave an insurer timely notice of an event or occurrence under a policy generally is a question for the factfinder"); *Plantation Pipeline Co. v. Royal Indem Co.*, 537 S.E.2d 165, 167 (Ga. Ct. App. 2000) (noting that "[a]n insured often may be able to present evidence of excuse or justification for the delay. . . . Whether the excuse or justification was sufficient and whether the insured acted diligently in giving the notice are generally questions of fact, to be determined by the jury, according to the nature and circumstances of each individual case" (internal quotations and citations omitted)); *Southern Trust Ins. Co. v. Clark*, 251 S.E.2d 823, 827 (Ga. Ct. App. 1978). However, "[a]n unexcused significant delay in notifying an insurer about an incident or lawsuit . . . may be unreasonable as a

matter of law." *Allstate Ins. Co. v. Walker*, 562 S.E.2d 267, 268 (Ga. Ct. App. 2002); *see also Richmond v. Georgia Farm Bureau Mut. Ins. Co.*, 231 S.E.2d 245, 249 (Ga. Ct. App. 1976) (holding that "[u]nder all of the facts and circumstances of a particular case it may be found that an insured's delay in giving notice of an accident to his insurer was unjustified" as a matter of law). For example, in *Kay-Lex Co. v. Essex Insurance Co.*, 649 S.E.2d 602 (Ga. Ct. App. 2007), the Georgia Court of Appeals held that a claimant's 12-month delay in providing notice of an accident was unreasonable as a matter of law where the underlying lawsuit involved the death of a young man who had been operating the claimant's forklift. *Id.* at 608; *see also Walker*, 562 S.E.2d at 268-69 (holding that one-year delay in notification was unjustified as a matter of law where the claimants stated that they failed to notify their insurance company about an accident because they were unaware that their insurance policy would provide coverage); *Townsend v. Nat. Union Fire Ins. Co.*, 397 S.E.2d 61, 63 (Ga. Ct. App. 1990) (holding a nearly 70-month delay in notification was unreasonable as a matter of law where the claimant's only justification for delay was that he was unaware he might be entitled to benefits ).

Pointing to *Forshee*, Payne argues that the "unique circumstances of the Accident" make Payne's failure to provide timely notice justifiable, or at the very least turn the issue of justification into a question of fact.  (Payne Resp. State Farm Mot. Summ. J. at 6.)  The claim in *Forshee* arose after the plaintiff in the underlying lawsuit broke her arm after falling in the parking lot of the claimant's

gas station. *Forshee*, 711 S.E.2d at 32-33. At the time of the fall, the plaintiff refused medical assistance, walked back to her car and drove away without providing any form of identification. *Id.* There was no evidence of serious injury. *Id.* at 33. The court held that the trial court erred in employing "the distorting effects of hindsight" when it found that the claimant had acted unreasonably in failing to notify his insurer of the accident. *Id.* The trial court should have considered what a reasonable person would have done with the information the claimant had at the time of the accident. *Id.*; *see also Guaranty Nat. Ins. Co. v. Brock*, 474 S.E.2d 46, 48 (Ga. Ct. App. 1996) (holding that a claimant is only required to "act reasonably under the circumstances" in providing timely notice of an accident to his insurer).

Georgia courts have indeed held that *Forshee* and cases like it present genuine questions of fact regarding whether a claimant was justified in failing to provide his insurer with timely notice of an accident. *See, e.g.*, *Southern Trust Ins. Co. v. Clark*, 251 S.E.2d 823, 827 (Ga. Ct. App. 1978) (holding that a claimant's 16-month delay in notifying his insurer about an accident was a question of fact for the jury to consider). However, these cases generally involve circumstances in which the claimant seeks to justify his delay by pointing to factors beyond either his lack of sophistication or his reliance on the advice of attorneys. In *Forshee*, for example, the plaintiff in the underlying lawsuit presented no visible evidence of serious injury at the time of the accident. She refused medical attention, failed to provide her name or contact information and

drove away from the scene. *See also Clark*, 251 S.E.2d at 825-26 (explaining that the claimant attempted to justify his delay in notifying his insurer about an accident because he had been driving a company truck when he caused the accident and therefore informed his company, which then informed the company insurer).

Conversely, the accident at issue in this case resulted in a woman's death. Payne was aware of the death, and he knew he held a State Farm homeowner's insurance policy at the time of accident. Payne has attempted to justify his delay in reporting the accident by asserting only that he "did not consider whether the homeowners' policy might provide coverage for the July 1, 2006 accident until James Neuberger raised the issue in January 2008."  (Payne Resp. SSMF ¶ 19; *see also* Pl. Resp. SMSJ at 8 (stating that "Payne did not have the slightest idea that the Policy might apply to the Accident and therefore had no idea that he might need to report the Accident")).  As the Georgia Court of Appeals made clear in *Walker*, "ignorance, or even misplaced confidence," does not justify a failure to provide timely notice of an accident to an insurer.  *Id.* at 268 (quoting *Protective Ins. Co. v. Johnson*, 352 S.E.2d 760, 761 (Ga. 1987)) (internal quotations omitted).

Accordingly, in this case, Payne's failure to provide State Farm with timely notice of the accident was unreasonable as a matter of Georgia law.  Indeed, attempts such as Payne's to justify breach of a notice provision solely on the basis of ignorance have been roundly rejected by the Georgia courts as a matter of law.

*See, e.g.*, *Walker*, 562 S.E.2d at 268-69; *Townsend*, 397 S.E.2d at 63.  As in *Kay-Lex*, Payne attempted to justify his 18-month delay in notification by contending that he was unaware that he was covered for the accident under the terms of his State Farm policy.  And as *Kay-Lex* made clear, justification requires more than an assertion of mere ignorance in order to give rise to a question of fact.

Finally, Payne contends in the alternative that, although he did not notify State Farm about the accident until January 2008, and although there is no indication that State Farm waived the notice requirement, there is evidence that State Farm received notice well within the notice period mandated in the policy.  Payne states that an entry in State Farm's claims system indicates it received notice of his claim on the day of the accident, July 1, 2006.  (Pl.'s Resp. State Farm Mot. Summ. J. at 5.)  Additionally, a note in State Farm's records indicates that a State Farm employee named Patrick Hill had a conversation with another employee named CaSaundra Wilkins in which Hill stated that he had been aware of the accident since early 2007.  (*Id.*)  Since notice may be given by a third party for purposes of fulfilling a notice provision in Georgia, Payne argues that State Farm cannot deny his claim for failure to provide timely notice.  *Chadbrooke Ins. Co. v. Fowler*, 426 S.E.2d 578, 580 (Ga. Ct. App. 1992); *Thomas v. Atlanta Cas. Co.*, 558 S.E.2d 432, 436 (Ga. Ct. App. 2001).

Payne's third party notice argument is also unavailing.  Even if some unknown third party had notified State Farm about the July 1, 2006 accident in a timely manner, there is no indication that State Farm ever received notices,

demands or summonses related to the accident "immediately" after they were served on Payne.  As a result, even if State Farm received timely notice of the accident, Payne was still in breach of the policy provision that the insured immediately provide such notices, demands or summonses to the insurer. Accordingly, State Farm is under no obligation to Payne to provide coverage for claims arising out of the accident.  State Farm's Motion for Summary Judgment is therefore **GRANTED**.

## IV.    CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 67] is **DENIED**.  Furthermore, Plaintiff's Motion to Strike State Farm's Notice of Supplemental Authority [Doc. 114] is **DENIED**.  Defendant Infinity's Motion for Summary Judgment [Doc. 65] is **GRANTED**.  Defendant State Farm's Motion for Summary Judgment [Doc. 70] is also **GRANTED**.  Defendant Infinity's Motion Strike the Report and Testimony of Gary M. Cooper [Doc. 63] and Defendant State Farm's Motion to Strike the Report and Testimony of Gary Cooper [Doc. 64] are **DENIED AS MOOT**.  As no matters remain pending, the Clerk is **DIRECTED** to close the case.

**IT IS SO ORDERED** this 28th day of August, 2012.

Amy Totenberg
United States District Judge